UNITED STATES
U.S. ENVIRONMENTAL PROTECTION AGENCY, REGION 8

2013 MAR 26  PM 1:18

FILED
EPA REGION VIII
HEARING CLERK

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | FEDERAL COMPLIANCE |
| The Bureau of Land Management | ) | AGREEMENT |
| | ) | |
| BLM Colorado Front Range District | ) | Docket No. CWA–08–2013–0020 |
| 3028 E. Main St. | ) | |
| Canon City, CO 80212 | ) | |

## I.  INTRODUCTION

1.  This Federal Compliance Agreement (FCA) is entered into voluntarily between Region 8 of the United States Environmental Protection Agency (EPA) and the United States Bureau of Land Management (BLM) State of Colorado Front Range District, pursuant to section 313 of the Clean Water Act (CWA), 33 U.S.C. § 1323, and Executive Order No. 12088.

2.  The BLM agrees to abide by all the terms and conditions of this FCA. No statement in this FCA shall be considered an admission by any party to this FCA. By entering into this FCA, the BLM does not waive any claim, right, or defense that it may raise in any other proceeding or action.

3.  The BLM, its officers, agents, contractors, servants, employees, successors, assigns, and all persons, departments, agencies, firms, and corporations in active concert or participation with them will take all necessary steps to ensure compliance with the provisions of this FCA. The BLM shall give written notice of this FCA to any prospective successor in interest. At least 90 calendar days prior to transfer of ownership or operation of either or both wells described below, the BLM shall give written notice of such transfer or change in ownership or operation to EPA at the address given below.

4.  The undersigned representative of each party to this FCA certifies that s/he is fully authorized by the party s/he represents to enter into the terms and conditions of this FCA and to execute and legally bind that party to it.

EXHIBIT 1

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.   The BLM is a bureau within the Department of the Interior, which is an agency of the Executive Branch of the United States. The Front Range District has jurisdiction over the public lands in the geographic areas covered by the Royal Gorge Field Office and the San Luis Valley Field Office in Colorado.

2.   The BLM has efforts underway to repair and/or plug and abandon two artesian wells located at the BLM's Park Center near Canon City, in Fremont County, Colorado. This FCA will reference Well No. 76841-F as the "old well," and will reference Well No. 289746 as the "new well." A portion of the water produced by these wells is leased to the Park Center Water District (the Water District) by the BLM and constitutes a substantial portion of the domestic water for approximately 4,000 individuals in the Water District.

3.   The old well, developed in the 1930s, has begun to fail, prompting the BLM to undertake efforts to plug and abandon the well as soon as practicable. A leak from the old well currently discharges approximately 180 gallons per minute into Fourmile Creek. It is not possible to contain the leak until the old well has been properly plugged and abandoned. The discharge originates at the well-head and travels across the ground for approximately 250 feet before entering Fourmile Creek.

4.   Construction on the new well began in 2010. Due to well failure after construction, it leaked at approximately 66 gallons per minute into Fourmile Creek through an outlet control structure approximately 75 feet from the well head. This leak was stopped in October 2012. The new well is not in service but is no longer leaking into Fourmile Creek.

5.      When the BLM constructed the new well it did not foresee uncontrolled discharges from either the old or new well. Therefore, neither the BLM nor any of its contractors has obtained, or has applied to the EPA or the State of Colorado for, a CWA National Pollutant Discharge Elimination System (NPDES) permit to authorize any discharges from the old well or the new well into Fourmile Creek.

6.      The BLM plans either (a) to plug and abandon the old well when the new well is completed and put into service or (b) to plug and abandon both wells if the new well cannot be fixed. The BLM expects either course of action will be accomplished in 2013, barring unforeseen operational and/or construction issues. The BLM will notify the EPA in writing as soon as a decision is made but no later than September 30, 2013, of its decision whether to plug and abandon the new well. Because the old well currently provides the sole domestic water supply for approximately 4,000 individuals in the Water District, it is not feasible to plug and abandon the old well before the new well is completed. Before plugging and abandoning the old well and putting the new well into service, the discharge will continue from the old well to Fourmile Creek. The BLM also proposes to discharge water during the completion of the new well, assuming that the BLM does not decide to plug and abandon this well.

7.      The groundwater that has been discharged from the wells to Fourmile Creek includes various pollutants, as that term is defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6), including but not limited to heat, total suspended solids (TSS), arsenic and radionuclides (e.g., naturally occurring uranium).

8.      In this FCA, the term "discharge" has the same meaning as in section 502(16) of the CWA, 33 U.S.C. § 1362(16).

9.   Fourmile Creek is a seasonal tributary of the Arkansas River (an interstate, navigable-in-fact river) and, therefore, constitutes a "water of the United States" as that term is defined in 40 C.F.R. § 122.2 and a "navigable water" as that term is defined in section 502(7) of the CWA, 33 U.S.C. § 1362(7).

10.   Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant by any person into navigable waters except, among other things, as in compliance with section 402 of the CWA, 33 U.S.C. § 1342.

11.   Section 402 of the CWA, 33 U.S.C. § 1342, sets forth a permitting system authorizing the EPA to issue permits authorizing discharges of pollutants into navigable waters. Although the EPA has approved Colorado's NPDES program pursuant to section 402(b) of the CWA, 33 U.S.C. § 1342(b), the EPA retains primary authority for permitting discharges from federal agencies.

12.   Section 313 of the CWA, 33 U.S.C. § 1323, requires federal agencies to be subject to and to comply with all federal water pollution control requirements to the same extent as any nongovernmental entity.

13.   The actions required by this FCA are necessary to achieve the CWA's objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." See section 101(a) of the CWA, 33 U.S.C. § 1251(a).

### III.   COMPLIANCE PROGRAM

1.   Beginning on the effective date of this FCA, the BLM shall take all practicable steps to eliminate the discharge of any pollutant from the old well or the new well that would cause any of the following in-stream or discharge concentration limits to be exceeded. The BLM will monitor for pollutants, when there is a discharge from an outfall, as described below.

| Table 1: In-Stream Parameters for Fourmile Creek | 30-Day Average | 7-Day Average | Daily Maximum | Monitoring Frequency |
|---|---|---|---|---|
| In-stream flow, in gallons per day (gpd) at UP1. Note: UP1 is an upstream monitoring location described in section III.2, below. | n/a | n/a | n/a | Monthly (see notes a, b and m) |
| In-stream temperature at UP1, in degrees Celsius | n/a | n/a | n/a | Monthly (see notes a, b and m) |
| In-stream temperature at DP1, in degrees Celsius. Note: DP1 is a downstream monitoring location described in section III.2, below. | See note c | n/a | See note c | Monthly (see notes b, c and m) |
| In-stream flow, in gallons per day (gpd), at DP1 | n/a | n/a | n/a | Monthly (see notes a and b) |
| In-stream total hardness, measured in mg/l of $CaCO_3$ at DP1 | n/ a | n/a | n/a | Quarterly (see notes a and b) |
| In-stream total suspended solids (TSS), in mg/l, at DP1 and UP1 | n/a | n/a | n/a | During the first 24 hours after an uncontrolled event, if triggered as described in note d (see also notes a and b) |
| In-stream turbidity in nephelometric turbidity units (NTUs), at DP1 and UP1 | n/a | n/a | n/a | Daily, if triggered as described in note d (see also notes a and b) |
| In-stream color, at DP1 | n/a | n/a | n/a | Daily, if triggered as described in note d (see also notes a and b) |
| In-stream pH, in standard units (s.u.), at DP1 | n/a | n/a | n/a | Daily, if triggered as described in note d (see also notes a and b) |

| Table 2: Discharge Parameters for Outfalls 001 and 002 (See Par. III.2, below, for descriptions of Outfalls 001 and 002) | 30-Day Average | 7-Day Average | Daily Maximum | Monitoring Frequency |
|---|---|---|---|---|
| Flow of discharge, in gallons per day (gpd), for Outfall 001 | n/a | n/a | 300,000 | Monthly (see notes b, c, d, f, and g) |
| Flow of discharge, in gpd, for Outfall 002 | n/a | n/a | 0 | Monthly (see notes b, c, d, f, g, j and m) |
| Temperature of discharge, in degrees Celsius | See note c | n/a | See note c | Monthly (see notes a, b, c and m) |
| Color of discharge | Visually clear | Visually clear | Visually clear | Monthly, by visual monitoring (see notes b and d) |
| pH of discharge, in s.u. | n/a | n/a | See note e | Quarterly (see notes b and d) |
| Total suspended solids (TSS) in discharge, in mg/l | 30 | 45 | n/a | Quarterly (see notes b and d) |
| Turbidity, in NTUs | n/a | n/a | n/a | Quarterly, monitoring changes to daily, if triggered as described in note d (see notes b and d) |
| Arsenic in discharge, in micrograms per liter (µg/l) | 10 | n/a | 340 | Quarterly (see notes b and h) |
| Total chromium in discharge, in mg/l | See note i | See note i | See note i | See notes b and i |
| Nickel in discharge, in mg/l | See note i | See note i | See note i | See notes b and i |
| Silver in discharge, in mg/l | See note i | See note i | See note i | See notes b and i |
| Uranium in discharge, in µg/l | n/a | n/a | n/a | Quarterly (see notes a and b) |

| | | | | |
|---|---|---|---|---|
| Gross alpha particles in discharge, in picocuries per liter (pCi/l) | n/a | n/a | n/a | Quarterly (see notes a and b) |
| Total residual chlorine in discharge (for Outfall 002 only), in mg/l | n/a | n/a | Non-detectable | Daily, if discharging for well completion (see notes b and l) |

Table notes:

    a.  No applicable parameter limit; monitor only.

    b.  All monitoring (other than flow, which is to be by meter or gauge, or visual monitoring) will be by grab sample. A grab sample is defined as a single sample or measurement taken at a specific time or over as short a period as feasible.

    c.  The BLM will ensure that the thermal component of its ongoing and anticipated discharges (e.g., from well completion) will not have an adverse impact on aquatic life. For temperature at DP1, UP1, and the outfalls, Table 1 requires monitoring but no limit, if either of the following occurs:

        1.  The BLM obtains written concurrence within 60 days of the effective date of this FCA from the Parks and Wildlife Division of the Colorado Department of National Resources (CPW) that the BLM's current and planned discharges will not adversely impact Fourmile Creek. In obtaining the CPW's concurrence, the BLM must seek consultation with the CPW and provide the CPW any monitoring data or information that the CPW may request. The BLM will also coordinate with the CPW to develop any appropriate mitigation as determined by the BLM and the CPW to address impacts from uncontrolled discharges, including the potential impact of well completion.

2. The BLM submits results of a field study, including but not limited to existing or new monitoring results, to the EPA within 60 days of the effective date of this FCA regarding impacts of the BLM's discharge on Four Mile Creek, and the EPA concludes, on the basis of this study and any other relevant information, that the BLM's discharge is not reasonably anticipated to cause or contribute to a violation of any water quality standard for temperature in Four Mile Creek.

Absent either demonstration above, the following temperature limits will apply at DP1: From November 1st through March 31st the 30-day average limit is 9 degrees Celsius, and the daily maximum limit is 13 degrees Celsius. From April 1st through October 31st the 30-day average limit is 19 degrees Celsius, and the daily maximum limit is 24.6 degrees Celsius. In the event of adverse impacts from the BLM's discharge, the EPA may revise these limits as appropriate, including but not limited to adding effluent limitation(s) at either or both outfall(s).

d. If an uncontrolled well discharge (see paragraph 9 of this section, below, for the definition of this term) occurs and/or if the discharge(s) from Outfall 001 and/or Outfall 002 exceed(s) the maximum allowable daily flow, then the BLM will, in addition to the monitoring otherwise required above, monitor daily (i) for turbidity, pH, color, temperature and flow at the site of the uncontrolled discharge, if any, or (ii) for color, turbidity, pH, and flow at the outfall, if any, for which the flow maximum has been exceeded, and for either of the above situations also (iii) for color, turbidity, temperature and pH at DP1 and UP1. During the first 24 hours after BLM is aware of

an uncontrolled event, it will sample for TSS at the point of discharge, at UP1, and at DP1; BLM will do so when taking samples for turbidity at these locations. For any uncontrolled discharge, sampling will occur during the duration of the uncontrolled discharge and for an additional five days thereafter, and flow volume may be estimated rather than measured if measurement is not reasonably possible. For long-term uncontrolled discharges, i.e., those uncontrolled discharges lasting more than 10 days, the BLM's site-specific discharge control plan (see paragraph 9 of this section, below) will outline the required sampling parameters and frequency.

e. The pH of each discharge is to be no less than 6.5 and no greater than 9.0 at any time.

f. The BLM will control the flow from Outfall 001 with a Parshall flume to monitor its flow accurately prior to discharge into Fourmile Creek. The BLM will also control any discharge from Outfall 002 in order to accurately measure the discharge rate.

g. The EPA may, in consultation with the BLM, request an amendment to this FCA to adjust the maximum allowable flow rate(s) for Outfall 001 and/or 002.

h. The analysis for total recoverable arsenic must be done with an analytical method able to detect a level of 1.6 µg/l or less. Any self-monitoring result less than 1.6 µg/l may be reported as non-detect and will be considered as zero for purposes of compliance with this FCA.

i. The EPA may, in consultation with the BLM, require the BLM to monitor and report discharges of nickel, silver, and total chromium.

j. The parties may modify the maximum allowable flow and the daily sampling frequency for Outfall 002 if the final site-specific discharge control plan justifies modifications related to well completion.

k. The EPA may waive any discharge or in-stream limitation in this FCA upon a demonstration by the BLM pursuant to section VI of this FCA that the effluent limitation has been caused by a force majeure.

l. If chlorine is used in the new well its discharge must be sampled and analyzed for chlorine. The analysis for total residual chlorine must be done with an analytical method able to detect a level of 50 µg/l or less. Any self-monitoring result less than 50 µg/l may be reported as non-detect and will be considered as zero for purposes of compliance with this FCA.

m. The monitoring frequency changes to daily when discharging from the new well during well completion. The BLM shall notify the EPA of any planned completion of the new well no later than 10 days before beginning any discharge related to well completion. The BLM shall also notify the EPA that discharges relating to well completion have finished no later than 10 days after those discharges have ended.

2. The monitoring locations for each well's discharge will be located immediately prior to its discharge into Fourmile Creek. Outfall 001 is defined as the discharge from the Parshall flume into Fourmile Creek from the old well. Outfall 002 is defined as any discharge from the new well via the existing outlet control structure. In addition, within 30 days of the effective date of this FCA, the BLM will provide the EPA with proposed locations identified by longitude/latitude for the upstream (UP1) and downstream (DP1) monitoring locations. Point UP1 will be upstream of

each discharge location, and point DP1 will be downstream of each discharge location and after complete mixing with stream water has occurred. The EPA will review these locations and discuss any concerns with the BLM. The BLM will provide the location(s) of a new monitoring point or points consistent with any comments the EPA may provide the BLM.

3.   Within 45 days of the effective date of this FCA, the BLM will provide the EPA with either (a) monitoring results from two independent sampling events taken on different days for the old well for chromium, nickel and silver, or (b) data from any sampling in the last five years to illustrate the discharge characteristics for these parameters from the old or new wells. This is for the EPA's use in determining whether to require discharge limitations and/or additional monitoring for these parameters.

4.   If any discharge from Outfall 001 or 002 exceeds any discharge limit in Table 2, above, or if the BLM becomes aware of any evidence that the DP1 in-stream temperature may negatively affect the downstream aquatic life, the BLM will immediately (and in no event more than 72 hours after the BLM or any of its contractors discovers the exceedance or becomes aware of such evidence) stop all discharges to the maximum extent practicable and notify the EPA within 24 hours. The notification shall be by fax and/or email and will include the suspected cause of the exceedance, actions taken to address the exceedance or other circumstances, a description of how the water was managed during the time that no discharge was occurring, and actions taken to ensure that future discharges are within the limits identified in paragraph II.1. However, the requirement in this paragraph to stop all discharges will not apply to any discharge through an outfall that is in full compliance with the limitations in Table 2, provided that the in-stream

temperature limit at DP1 in Table 1 has not been exceeded, or BLM's consultation with DPW indicates its discharges will not adversely impact Fourmile Creek.

5.  All samples agreed to be taken in this FCA will be representative of the discharge. Sampling and analysis will be done in accordance with 40 C.F.R. part 136.

6.  The BLM will mail a copy of all monitoring results, including quality assurance/quality control data, to the EPA each quarter by the 15th day after the end of the relevant quarter. If no discharge occurs from an outfall during the relevant quarter, the BLM shall indicate "no discharge."

7.  This FCA may be amended in writing by both parties to include additional interim limitations or other requirements, as appropriate.

8.  The BLM will, to the maximum extent practicable, minimize adverse impacts from its discharges.

9.  The BLM will develop two separate site-specific discharge control plans to address controlled discharges and potential uncontrolled discharges. For purposes of this paragraph and note d, above, controlled discharges are defined as discharges that are a result of the development of the new well, and uncontrolled discharges are defined as ongoing leakage from the old well, discharges resulting from additional casing failure at the old well, and any unexpected and unplanned discharges that may occur during the development of the new well. The plans will address actual and potential adverse impacts to Fourmile Creek from the old well and the new well.

10. The plan for controlled discharges will include an analysis of economically feasible alternatives to address, to the maximum extent possible, impacts of any discharges on erosion and

sedimentation, thermal effects, and pollution from other contaminants. The plan for controlled discharges will also identify Best Management Practices (BMPs) to reduce adverse impacts from any discharge.

11.    The plan for uncontrolled discharges will not include an alternatives analysis, because it will be designed to respond to discharges where the only potential remedy to stop adverse impacts is to plug the well that is causing the uncontrolled discharge.  Rather, the plan for uncontrolled discharges will focus exclusively on BMPs that are designed to minimize adverse impacts until the well plugging operation is completed, including impacts on erosion, sedimentation, thermal effects, and pollution from other contaminants. The plan for uncontrolled discharges will include BMPs addressing site management, communication, discharge management, readiness to implement contracting processes to respond to emergencies, and readiness for water quality sampling.

12.    Both plans will include a proposed schedule for installation of any site controls or treatment equipment identified and selected in the plan. Both plans will also include a sampling plan, a map designating the locations of Outfalls 001 and 002, and an inspection checklist for BLM staff to use during inspections to properly review the practices used at the well site.

13.    The BLM will submit the controlled discharges plan to the EPA no later than 30 days prior to the date the BLM plans to initiate activities designed to complete the new well. The BLM shall submit the plan for uncontrolled discharges to the EPA within 60 days after both parties have executed this FCA. The EPA will provide comments to the BLM regarding the plans, and the BLM will consult with the EPA in arriving at plans satisfactory to both parties. Each party has 10 business days to respond to the other party's written comments. The BLM will begin

implementing each plan as approved by the EPA within 10 days of the BLM's receipt of the EPA's written approval of that plan.

14.   The BLM will conduct an inspection each business day of the area surrounding the two wells to assess the conditions of the wells, if an uncontrolled discharge has occurred, whether conditions indicate a reasonable probability of an uncontrolled discharge in the future, and the effectiveness of any BMPs constructed at or near the wells in accordance with the plans referenced in the preceding paragraph. During each inspection the BLM shall measure flow from the outfall(s) and annotate in its inspection log if there is flow in Fourmile Creek upstream of the outfalls. The BLM will document these inspections on a site inspection log, which will be made available to the EPA upon request. If conditions indicate a reasonable probability of an uncontrolled event BLM will also conduct the inspections on holidays and weekends.

15.   If a well failure occurs that causes either well to discharge uncontrollably into Fourmile Creek, the BLM will notify the EPA, the Colorado Department of Public Health and Environment (CDPHE) and DPW. The BLM will take all steps necessary in coordination with the EPA, CDPHE, and DPW to minimize adverse impacts to Fourmile Creek. The BLM will provide the EPA, CDPHE, and DPW notification by telephone immediately after discovery of the uncontrolled discharge. For purposes of this paragraph, any discharge (at a time other than during well completion) with a flow that is 150% or more of any maximum flow amount in Table 2 is an uncontrolled discharge.

16.   The BLM shall maintain the monitoring records and other documents generated under this FCA for at least three years after the date of this FCA and make them available for inspection or copying upon request by the EPA.

17.   The BLM will, no later than September 30, 2013, apply for an NPDES permit for any discharges from the old well or new well, unless by that date both wells have ceased discharging and are not reasonably expected to discharge in the future.

18.   Notification to the EPA of any noncompliance with any provision of this FCA or anticipated delay in performing any obligation under this FCA shall not excuse the BLM's noncompliance or anticipated delay unless the BLM demonstrates, pursuant to section VI, below, that the delay has been caused by a force majeure.

## IV.   NOTIFICATIONS

1.   Any notification to the EPA pursuant to this FCA is to be provided to:

>   LCDR David Gwisdalla, USPHS, P.E. (8ENF-W-NP)
>   U.S. Environmental Protection Agency, Region 8
>   1595 Wynkoop Street
>   Denver, CO  80202-1129
>   Telephone:  303-312-6193
>   Facsimile:  303-312-7202
>   Email:  gwisdalla.david@epa.gov

2.   All reports and information required by this FCA to be submitted to the EPA shall include the following certification statement, signed and dated by an individual meeting the definition in 40 C.F.R. §122.22(a)(3) of a principal executive officer:

>   I hereby certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine or imprisonment for knowing violations.

3.  Any notice to CDPHE pursuant to this FCA is to be provided to:

> Heather Drissel, P.E., CWP
> Southern Field Engineering Unit Manager
> WQCD Engineering Section
> Colorado Department of Public Health and Environment
> 4718 N. Elizabeth Street, Suite B
> Pueblo, CO 81008
> Telephone: 719-545-4650, extension 103
> 24 Hour Incident Reporting: 877-518-5608
> Facsimile: 719-543-8441
> Email: heather.drissel@state.co.us

4.  Any notice to DPW pursuant to this FCA is to be provided to:

> Jim Aragon
> Parks and Wildlife Division - Salida Area Office
> Colorado Department of Natural Resources
> 7405 Hwy 50
> Salida, CO 81201
> Telephone: 719-530-5520
> Facsimile: 719-530-5554
> Email: Jim.Aragon@state.co.us
> After-hours, contact the Fremont County Sheriff, 719-784-3411; dispatch
> can contact the Colorado Parks and Wildlife District Wildlife Manager on-
> call.

5.  Any notification to the BLM pursuant to this FCA is to be provided to:

> Keith Berger
> Field Manager
> Royal Gorge Field Office
> 3028 E. Main St.
> Canon City, CO 81212
> Telephone : 719-269-8500
> Fax : 719-269-8599
> Email : kberger@blm.gov

6.  Any party hereto may, by written notice, change the address to which future notices will be sent

or the identity of the person designated to receive notices hereunder. Actual receipt by an

individual specified above of any written notice, whether or not given in accordance with the terms of this paragraph, will be deemed to be notice given pursuant to this FCA.

## V.   DISPUTE RESOLUTION

1.   In the event of any conflict involving any violation of this FCA, the EPA and the BLM shall meet promptly and work in good faith in an effort to reach a mutually agreeable resolution of the dispute.

2.   Except as specifically set forth elsewhere in this FCA, if a dispute arises under this FCA, the procedures of this section shall apply. In addition, during the pendency of any dispute, the BLM agrees that it shall continue to implement those portions of this FCA which are not in dispute.

3.   The pendency of any dispute under this section shall not affect the BLM's responsibility to perform the work required by this FCA in a timely manner, except that the time period for completion of work affected by such dispute may, at the EPA's sole discretion, be extended for a period of time not to exceed the actual time taken to resolve any good faith dispute in accordance with the procedures specified herein. All elements of the work required by this FCA that are not affected by the dispute shall continue and be completed in accordance with applicable schedule.

4.   The EPA and the BLM shall make reasonable efforts to informally resolve disputes at the Project Manager or immediate supervisor level. "Project Manager" for the EPA and for the BLM shall mean David Gwisdalla and Keith Berger, respectively, whose contact information is in section IV (Notifications), or any duly identified successor.

5.   Within 14 days after any action that leads to or generates a dispute, the BLM shall submit to the EPA a written statement of dispute setting forth the nature of the dispute, the BLM's position with respect to the dispute, and the information the BLM is relying upon to support its position. If the BLM does not provide such written statement to the EPA within this 14-day period, the BLM shall be deemed to have agreed with the EPA's position with respect to the dispute.

6.   Upon the EPA's receipt of the written statement of dispute from the BLM, the EPA and the BLM shall engage in dispute resolution among the Project Managers and/or their immediate

supervisors. The parties shall have 14 days from the EPA's receipt of the written statement of dispute to resolve the dispute. During this period, the Project Managers shall meet or confer as many times as necessary to discuss and attempt resolution of the dispute. If agreement cannot be reached on any issue within this 14-day period, the BLM may, within 10 days after the conclusion of the 14-day dispute resolution period, submit a written notice to the EPA elevating the dispute to the Dispute Resolution Committee ("DRC") for resolution. If the BLM does not elevate the dispute to the DRC within this 10-day period, the BLM shall be deemed to have agreed with the EPA's position with respect to the dispute.

7.  The DRC will serve as a forum for resolution of disputes for which agreement has not been reached pursuant to the foregoing paragraphs in this section. Following elevation of a dispute to the DRC, the DRC shall have 30 days to unanimously resolve the dispute. The EPA's and BLM's designated representatives on the DRC are Art Palomares, Director of the Water Technical Enforcement Program, EPA Region 8, and Tom Heinlein, District Manager, BLM Royal George Field Office, respectively, or any duly authorized successor. If any party delegates authority from its previously referenced representative to another individual, notice of this delegation will be provided to the other party within seven days of delegation.

8.  If unanimous resolution by the DRC is not achieved within this 30-day period, a member of the DRC may, within 21 days after the conclusion of the 30-day dispute resolution period, submit a written Notice of Dispute to the Regional Administrator of Region 8 of the EPA for final resolution of the dispute. The BLM's Director for the State of Colorado may contact the Regional Administrator for EPA Region 8 prior to the resolution of the dispute. In the event that the dispute is not elevated to the Regional Administrator for Region 8 of the EPA within the designated 21-day period, the BLM shall be deemed to have agreed with the original EPA position with respect to the dispute.

9.    Within 21 days of resolution of a dispute pursuant to the procedures specified in this section, the
      BLM shall incorporate the resolution and final determination into the appropriate statement of
      work, plan, schedule, or procedures and proceed to implement this FCA according to the
      amended statement of work, plan, schedule, or procedures.

10.   Resolution of a dispute pursuant to this section of this FCA constitutes a final resolution of any
      dispute arising under this FCA. The parties shall abide by all terms and conditions of any final
      resolution of dispute obtained pursuant to this section.

## VI.   FORCE MAJEURE

1.    The BLM's obligations under this FCA shall be performed as set forth in this FCA unless
      performance is prevented or delayed by a force majeure event. For purposes of this FCA, "force
      majeure" is defined as any event arising from causes beyond the control of the BLM or of
      entities controlled by the BLM, including but not limited to contractors and subcontractors, that
      could not be overcome by the due diligence of the BLM or the entities controlled by the BLM,
      which delays or prevents the performance of any obligation under this FCA, including acts of
      God or war, labor unrest, and any judicial orders that prevent compliance with this FCA. Force
      majeure shall not include increased costs of performance of any activity required by this FCA or
      the failure to apply for any required permits or approvals or to provide all information required in
      a timely manner, nor shall it include the failure of contractors or employees to perform or the
      avoidable malfunction of equipment.

2.    If the BLM is having difficulty meeting its obligations as set forth in this FCA due to a force
      majeure event, it shall notify the EPA promptly by telephone of any change in circumstances
      giving rise to the suspension of performance or the nonperformance of any obligation under this
      FCA. In addition, within 14 days of the occurrence of circumstances causing such difficulty, it
      shall provide a written statement to the EPA of the reason(s), the anticipated duration of the
      event and delay, the measures taken and to be taken to prevent or minimize the time and effects

of failing to perform or delaying any obligation, and the timetable for the implementation of such measures. Failure to comply with the notice provisions shall constitute a waiver of any claims of force majeure. The BLM shall take all reasonable measures to avoid and/or minimize any such delay.

3. The burden of proving that any delay is caused by circumstances entirely beyond the control of the BLM shall rest with the BLM.

## VII.  FUNDING

1. It is the expectation of the parties to this FCA that all obligations of the BLM arising under this FCA, including any environmentally beneficial projects required, will be fully funded. The BLM agrees to use every legally available mechanism to seek sufficient funding through the BLM's budgetary process to fulfill its obligations under this FCA.

2. Provision herein shall not be interpreted to require obligations or payment of funds in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341. In cases where payment or obligation of funds would constitute a violation of the Anti-Deficiency Act, the dates established requiring the payment or obligation of such funds shall be appropriately adjusted within the terms delineated in this FCA.

3. If funds are not available to fulfill the BLM's obligations under this FCA, the EPA reserves the right to initiate an action against any other person, or to take any action which would be appropriate absent this agreement.

## VIII.   GENERAL PROVISIONS

1. In this FCA, "paragraph" and "section" refer to portions of this FCA identified by Arabic and Roman numerals, respectively.

2.  In this FCA, references to "days" are to calendar days. The last day or a time period shall be included, unless it is a Saturday, Sunday, or federal holiday, in which event the period will run until the end of the next day that is not a Saturday, Sunday, or federal holiday.

3.  The EPA and any contractor or other authorized representative of the EPA, upon providing prior notice to the BLM, shall have the right at any time to access the site of the old well and new well, in order to conduct any inspection, including but not limited to records inspection, sample testing, or monitoring, as they believe necessary to determine the BLM's compliance with this FCA. The EPA will make reasonable efforts to notify the BLM in advance of any instance in which the EPA accesses the site.

4.  Compliance with this FCA in no way affects or relieves the BLM of its obligation to comply with all applicable requirements of the CWA and regulations promulgated thereunder, or any other applicable requirement of federal, state, or local law. This FCA neither constitutes an NPDES permit nor relieves the BLM of the obligation to apply for such a permit by the date specified herein.

5.  Nothing in this Agreement shall be deemed to waive sovereign immunity of the United State beyond what is already provided in the CWA.

6.  This FCA constitutes the final, complete, understanding among the parties with respect to this matter. The parties acknowledge that they have no agreements, understandings or representations other than those expressly contained in this FCA. This FCA shall not be modified except in writing signed by all of the parties hereto or their authorized representatives.

7.  This FCA, or the signature pages thereof, may be executed in counterparts, all of which shall have full force and effect as an original, and facsimile signatures shall constitute originals for all purposes.

8.  This FCA shall terminate once the BLM has provided written notice to the EPA that (a) the old well has been properly plugged and abandoned, (b) the new well either has been properly plugged and abandoned or has been completed, and (c) no unpermitted discharges from either the old well or new well are reasonably anticipated. Alternatively, the FCA shall terminate after the BLM has been granted an NPDES permit for any remaining discharges.

9.  If any provision of this FCA or the application of this FCA to any party or circumstance is held by any judicial or administrative authority to be invalid, the application of such provision to other parties or circumstances and the remainder of this FCA shall remain in force and shall not be affected thereby.

10. The effective date of this FCA is the latest date of any party's signature, below.

FOR UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, REGION 8

Date: _3. 26.13_____          By: _____
                                   Andrew M. Gaydosh
                                   Assistant Regional Administrator
                                   Office of Enforcement, Compliance
                                      and Environmental Justice
                                   U.S. Environmental Protection Agency, Region 8
                                   1595 Wynkoop St.
                                   Denver, CO  80202-1129

Page 22 of 23

FOR THE BUREAU OF LAND MANAGEMENT

Date: 3-19-2013

By: _Helen Hankins_

Helen Hankins
State Director
BLM Colorado State Office
2850 Youngfield Street
Lakewood, CO  80215-7093