**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 13-cv-00701-RM-BNB

WALTER MYERS,
KATHERINE MYERS,
AMANDA WEAKLAND, and
PATRICK WEAKLAND,

    Plaintiffs,

v.

BUREAU OF LAND MANAGEMENT, an agency of the United States,

    Defendant, and

PARK CENTER WATER DISTRICT,

    Defendant-Intervenor.

---

**ORDER**

---

    The Clean Water Act ("CWA") provides in 33 U.S.C. § 1365(a)(1) that citizens may sue any person who is alleged to be in violation of an effluent standard or limitation. This is such an action.

    This matter is before the Court on Plaintiffs' Motion for Summary Judgment and Request for Injunctive Relief ("Motion"). (ECF No. 37.) The Motion is fully briefed with permitted surreplies. (ECF Nos. 75, 76, 88, 90, 92, 100-2, 102, 103, 104.)

    For the reasons set forth below, the Court GRANTS, in part, Plaintiffs' Motion. The Court GRANTS Plaintiffs' Motion to the extent it seeks a judgment that the Bureau of Land

Management ("BLM") violated the CWA. The Court DENIES Plaintiffs' request for injunctive relief.

I.  **LEGAL STANDARDS**

   A.  **Summary Judgment**

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569-70 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the non-moving party to move beyond the pleadings and to designate evidence which demonstrates the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted).

If a movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in her pleadings, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007)

(holding that "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact") (citation omitted).

Only admissible evidence may be considered when ruling on a motion for summary judgment. *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (citation omitted) (holding that hearsay evidence is not acceptable in opposing a summary judgment motion); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). Affidavits must be based on personal knowledge and must set forth facts that would be admissible evidence at trial. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted). "Conclusory and self-serving affidavits are not sufficient." *Id*. The Court will not consider statements of fact, or rebuttals thereto, which are not material or are not supported by competent evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3). "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (internal quotation and citation omitted). The Court is not obligated to comb the record in order to make arguments for a party. *See Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000). Further, Local Rule 7.1(e) provides that "[e]very citation in a motion, response or reply shall include the specific page or statutory subsection to which reference is made." D.C. Colo. L. Civ. R. 7.1(e).

### B.   Permanent Injunctive Relief

"To obtain a permanent injunction, a plaintiff must show: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not

adversely affect the public interest.'" *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (quoting *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009)). It is "the movant's burden to establish that each of these factors tips in his or her favor." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003) (citation omitted). If a plaintiff fails to meet its burden on any of these four requirements, its request must be denied. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 23-24 (2008) (denying a request for injunctive relief on the public interest and balance of equities requirements alone even as the Supreme Court assumed irreparable injury to an endangered species and a violation of the environmental statute at issue).

## II.   BACKGROUND

### A.   Factual Background[1]

The facts as recited below are based on adequate citations to the record which would be admissible at trial or based on uncontested averments in the parties' respective filings.

#### 1.   The Wells at Issue

BLM owns two wells near Fourmile Creek north of Canon City, Colorado. (ECF No. 76 at 2.) These two wells are known as the "Old Well" and the "New Well." Beginning in 1968, the Old Well supplied water to Park Center Water District ("Park Center"). (ECF No. 76-8, BLM Park Center Well History of Use.) The Old Well presently supplies water to Park Center including 1,420 taps and 4,000 users. (ECF No. 76-9, Aff. of Charles J. Well ¶ 5.) Also, BLM

---

1 Plaintiff's Motion fails to include a statement of facts as required by the Court's practice standards. Plaintiff later submitted its statement of facts in support of its Motion. (ECF No. 72.) Plaintiff requests that the Court consider its additional facts submitted in its "Substituted Reply in Support of Motion for Summary Judgment and Request for Permanent Injunctive Relief." (ECF No. 102 at 7 n.1.) The Court is not persuaded that *Walker v. City of Orem*, 451 F.3d 1139, 1155-56 (10th Cir. 2006) compels the Court to consider these new facts. In *Walker*, the district court did not exclude the plaintiff's additional facts. *Id*. The Tenth Circuit considered these additional facts based upon the district court's treatment of the case. *Id*. More importantly, nothing in Plaintiffs' "Additional Undisputed Facts" would materially affect the holdings the Court reaches in this matter.

provides approximately 16 acre-feet of water from the Old Well annually to the City of Cripple Creek ("Cripple Creek"). (ECF No. 76-11, Stipulation ¶ 4; ECF No. 76-13, Decl. Roy E. Smith ¶ 3(b).)

In 2008, it was decreed that BLM could divert 227 acre-feet of water per year from the Old Well. (ECF No. 76-2, Ruling at 2, 3.) In 2008, BLM entered into a new lease with Park Center in which Park Center is given the right to take up to 521 acre-feet of water from the Old Well per year "for municipal, domestic, and incidental irrigation, augmentation, exchange, and substitute plan purposes," subject to the lease terms. (ECF No. 76-12, 2008 Lease at § 1(A).) The provision of the full 521 acre-feet is contingent on BLM's successful application to the Colorado Water Division 2 Court for an additional 500 acre-feet of nontributary groundwater. (ECF No. 76-12, 2008 Lease at § 1(D).)

Diversions from the Old Well have totaled more than 227 acre-feet per year due to an uncontrolled leak from the Old Well. (ECF No. 76-13, Decl. Smith ¶ 3(c).) The Old Well is currently discharging. (*Compare* ECF No. 75 ¶ 5 *with* ECF No. 102 at 3.) Discharges from the Old Well into Fourmile Creek include various pollutants, as that term is defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6), including but not limited to heat, total suspended solids, arsenic, and radionuclides. (ECF No. 37-3 at 3, FCA § II.7-8.) Fourmile Creek is a seasonal tributary of the Arkansas River (an interstate, navigable-in-fact river) and constitutes a "water of the United States" as that term is defined in 40 C.R.R. § 122.2 as well as a "navigable water" as that term is defined in section 502(7) of the CWA, 33 U.S.C. § 1362(7).

On December 31, 2012, with regard to the Old Well, BLM and Park Center jointly filed an Application for Plan of Augmentation with the Colorado District Court, Water Division 2, Case No. 2012 CW 125 ("Augmentation Application"). (ECF No. 76-3.) The proposed withdrawal

amount is 770 acre-feet per year.  (ECF No. 76-3 at 4.)   The Augmentation Application anticipates discharges from the Old Well into Fourmile Creek.  (ECF No. 76-3 at 3.)   Objections have been filed to the Augmentation Application and a trial is set for 2016.  (*Compare* ECF No. 76 ¶ 19 *with* ECF No. 102 at 2.)

In 2009, BLM issued an "Environmental Assessment" regarding drilling the "New Well" and capping the Old Well.  (ECF No. 76-17; *compare* ECF No. 76 ¶ 24 *with* ECF 102 at 2.)  During drilling of the New Well since 2010, water, drilling mud, and portions of the drilling rig pad have been discharged into Fourmile Creek.  (ECF No. 76-19, BLM News Release; ECF No. 76-20, BLM Information Memorandum; ECF No. 76-21, Contract Diary Aug. 7, 2010; ECF No. 76-22, Early Alert; *compare* ECF No. 76 ¶ 29 *with* ECF No. 102 at 2.)   BLM anticipates that the cost to finish the New Well and shut down the Old Well will be approximately $2.8 million.  (ECF No. 76-26, Decl. Sara Dawson ¶ 3.)

In March 2013, BLM and the United States Environmental Protection Agency ("EPA") entered into a "Federal Compliance Agreement" ("FCA").  (ECF No. 76-28, FCA.)   The FCA required, no later than September 30, 2013, BLM to apply for a National Pollutant Discharge Elimination System ("NPDES") permit "for any discharges from the old well or new well, unless by that date both wells have ceased discharging and are not reasonably expected to discharge in the future."  (ECF No. 76-28, FCA ¶ III.17.)   On September 30, 2013, BLM submitted an NPDES permit application for discharges from the Old Well, from the New Well, and for overflows.  (ECF No. 76-29, Application.)   Additionally, the FCA requires BLM to develop two separate site-specific discharge control plans to address (1) "controlled discharges," *i.e.*, "discharges that are a result of the development of the [New Well]," and (2) "uncontrolled discharges," defined as "ongoing leakage from the [Old Well], discharges from additional casing failure at the [Old Well],

6

and any unexpected and unplanned discharges that may occur during the development of the [New Well]." (ECF No. 76-28, FCA ¶ III.9.)   On June 18, 2013, BLM submitted a "Plan for Management of Controlled Discharge," and a "Plan for Management of Uncontrolled Discharges" to EPA for review and approval.  (ECF Nos. 76-30, 76-31; *compare* ECF No. 76 ¶ 36 *with* ECF No. 102 at 2.)   The FCA requires BLM to "take all practicable steps to eliminate the discharge of any pollutant from the [Old Well] or the [New Well] that would cause any . . . in-stream or discharge concentration limits to be exceeded" as delineated in the FCA.  (ECF No. 76-28, FCA ¶ III.1.)   The pollutants BLM must control or eliminate, as listed in the FCA, include, among others:  heat, total suspended solids, arsenic, and uranium.  (ECF No. 76-28, FCA ¶ III.1.)   The FCA requires that BLM coordinate with the EPA, the Colorado Department of Public Health and Environment, and the Colorado Division of Parks and Wildlife "to minimize adverse impacts to Fourmile Creek" in the event of any uncontrolled discharge from the Old or New Wells.  (ECF No. 76-28, FCA ¶ III.15.)

        2.    <u>Park Center</u>

Pumping water to Park Center residents from the closest municipal water provider is financially prohibitive.  (ECF No. 75-8, Aff. James Wade ¶ 2.)   Since its inception, Park Center has leased water from BLM.  (ECF No. 75-8, Aff. Wade ¶ 3.)   Park Center has only one other principal source of water:  surface water from the Canon Heights Irrigation and Reservoir Company ("Canon Heights").  (ECF No. 75-8, Aff. Wade ¶ 6.)   When Canon Heights' surface water is not available to Park Center, Park Center's customers are solely reliant upon BLM's well water.  (ECF No. 75-8, Aff. Wade ¶ 7.)   During drought conditions from June 2012 through January 1, 2013, BLM's well water supplied 99.3% of Park Center's water usage.  (ECF No.

75-8, Aff. Wade ¶ 10.)   From January 1, 2013 to September 30, 2013, BLM's well water supplied 84% of Park Center's water usage.   (ECF No. 75-8, Aff. Wade ¶ 10.)

Although connection of Park Center's users to Canon City's water supply is physically possible, such a connection is cost-prohibitive due to technical problems.   (ECF No. 75-8, Aff. Wade ¶ 12.)   If Canon City's water were pumped to Park Center's users, such pumping would destroy Park Center's existing water systems.   (ECF No. 75-8, Aff. Wade ¶ 12.)   The total cost to improve Park Center's water systems to accommodate water from Canon City would likely exceed $2.5 million.   (ECF No. 75-8, Aff. Wade ¶ 12.)   Additionally, costs of treated water from Canon City would be triple the cost of Park Center's water.   (ECF No. 75-8, Aff. Wade ¶ 12.)

### 3.     The Alleged Harm

The Weaklands do not live on the property they own south of the Old Well discharges and there are no buildings on that property.   (*Compare* ECF No. 76 at ¶ 37 *with* ECF No. 102 at 2.)

Prior to the 2010 discharges, Walt Myers used his well water for drinking exclusively. (ECF No. 100-3, Aff. Walter Myers ¶ 11.)   Walt Myers also used his well for other domestic purposes.   (ECF No. 100-3, Aff. Myers ¶ 11.)   Walt Myers cannot enjoy the fish and wildlife found in Fourmile Creek prior to the 2010 blowout and current discharges.   (ECF No. 100-3, Aff. Myers ¶ 10.)   The Myers have no desire to or intention of moving as a result of the discharges. (ECF No. 75-1, K. Myers Dep. 30:18-31:19.)   The Myers' irrigation and farming water needs have been and are fulfilled using water from Canon Heights.   (ECF No. 75-1, K. Myers Dep. 44:20-45:16.)   The discharges have not affected the Myers' ability to use their land for gardening or cultivating grapes from their vineyard.   (ECF No. 75-1, K. Myers Dep. 44:20-45:16.)

**B.     Procedural Background**

On March 18, 2013, Plaintiffs filed their Complaint which alleges that BLM violated the CWA by discharging pollutants into Fourmile Creek from the Old and New Wells.  (ECF No. 1 ¶¶ 1, 2, 27, 32, 34-38.)  Plaintiff's Complaint has three claims for relief.  (ECF No. 1.)  On August 9, 2013, BLM filed a motion for partial dismissal of the Complaint.  (ECF No. 26.)  Prior to the Court's ruling on BLM's partial motion to dismiss (ECF No. 26), Plaintiffs filed a motion for summary judgment and request for injunctive relief (ECF No. 37).

On November 6, 2013, Park Center filed a motion to intervene.  (ECF No. 42.)  On November 7, 2013, the Court granted Defendant Park Center's motion to intervene.  (ECF No. 49.)

On February 12, 2014, Magistrate Judge Boland recommended that BLM's motion for partial dismissal (ECF No. 26) be granted as it seeks dismissal of Claims Two and Three of Plaintiffs' Complaint and dismissal of Plaintiffs' claim for civil penalties against BLM.  (ECF No. 84 at 6-7.)  The Court adopted the Recommendation, to wit, the Court dismissed Plaintiffs' Second Claim for Relief, dismissed Plaintiffs' Third Claim for Relief, and dismissed Plaintiffs' claim for civil penalties against BLM.  (ECF No. 108 at 2.)

Plaintiffs' Motion seeks that "the Court grant Plaintiffs judgment in their favor and an [o]rder halting the illegal discharge within ten (10) days of the Court's Order."  (ECF No. 37-2 at 16.)  Plaintiffs, in their reply brief in support of their motion, modified their requested relief.  (ECF No. 102 at 19.)  Plaintiffs now seek that the Court issue an order "compelling the abandonment of the Old Well within . . . 7 to 10 months . . . in order to halt the ongoing illegal discharges and discontinue the degradation of Fourmile Creek.  In addition, if Defendants choose to continue . . . to drill the New Well . . . they should be compelled to file a feasibility study with

the Court within five months. . . ."  (ECF No. 102 at 19.)   Plaintiffs requested an "adjudicatory hearing on the equitable portion of the instant motion."   (ECF No. 102 at 19.)

BLM asks that the Court deny Plaintiffs' request for a permanent injunction.   (ECF No. 104 at 10.)   Park Center asks that the Court deny Plaintiffs' Motion and request for a permanent injunction.   (ECF No. 103 at 7.)

## III.   ANALYSIS

### A.   Summary Judgment

Though Defendant BLM does not contest that it violated the CWA by discharging pollutants into Fourmile Creek via its Old and New Wells (ECF No. 76 at 1-2), the Court must satisfy itself that Plaintiffs' carried their burden.   *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

Section 301(a) of the CWA states that "the discharge of any pollutant by any person shall be unlawful," unless authorized by an NPDES permit.   33 U.S.C. § 1311(a).   In this case, it is uncontested that BLM does not have an NPDES permit for either the Old Well or New Well. Thus, at issue is whether BLM "discharged a pollutant."

"Discharge of a pollutant" means the "addition of any pollutant to navigable waters from any point source."   33 U.S.C. § 1362(12)(A).    The CWA defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, *heat*, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."   33 U.S.C. § 1362(6) (emphasis added).   The CWA defines "navigable waters" as "waters of the United States, including the territorial seas."   33 U.S.C. § 1362(8).   The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch,

channel, tunnel, conduit, *well*, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."   33 U.S.C. § 1362(14) (emphasis added).

BLM admits that it discharged from the Old and New Wells.   (ECF No. 76-28, FCA ¶ II.7.)   The Old and New Wells constitute "point sources" as defined by section 502(14) of the CWA, 33 U.S.C. § 1362(14).   The discharges from the Old and New Wells into Fourmile Creek include various *pollutants*, as that term is defined in section 502(6) of the CWA, 33 U.S.C. § 1362(6), including but not limited to *heat*, total suspended solids, arsenic and radionuclides. (ECF No. 76-28, FCA ¶ II.7.)   BLM admits that Fourmile Creek is a seasonal tributary of the Arkansas River (an interstate, navigable-in-fact river) and, therefore, constitutes a "water of the United States" as that term is defined in 40 C.F.R. § 122.2 and a "navigable water" as that term is defined in section 502(7) of the CWA, 33 U.S.C. § 1362(7).   (ECF No. 76-28, FCA ¶ II.9.)

Therefore, the Court finds that Defendant BLM violated the CWA.

**B.     Permanent Injunctive Relief**

An injunction is an extraordinary remedy which is never to be awarded as of right. *Winter*, 555 U.S. at 8.   In order to obtain a permanent injunction, a requesting party must demonstrate:   "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."   *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003).

In the context of the CWA, "[n]ot all violations of the [CWA] warrant an injunction." *Sierra Club v. El Paso Gold Mines, Inc.*, Case No. 01 PC 2163 OES, 2003 WL 25265873, at *12 (D. Colo. Feb. 10, 2003) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314-15 (1982) and

*Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 544 (1987) and *Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir. 1989)). The "Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of [a] statutory violation." *Marsh*, 884 F.2d at 651. The exercise of equitable discretion, "which must include the ability to deny as well as grant injunctive relief," prompts that an "injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger*, 456 U.S. at 312 (quoting *Cavanaugh v. Looney*, 248 U.S. 456, 456 (1919)). The Supreme Court repeatedly holds that the "basis for injunctive relief in the federal courts [is] irreparable injury and the inadequacy of legal remedies." *Id*. (citations omitted). "Great care must be used in the granting of . . . final injunctive relief because of the extraordinary nature of that remedy." *Comm'l Sec. Bank v. Walker Bank & Trust Co.*, 456 F.2d 1352, 1356 (10th Cir. 1972).

    1. <u>Actual Success on the Merits</u>

The Court has found that BLM has violated the CWA, thus Plaintiffs have demonstrated actual success on the merits of their claim (ECF No. 1 at ¶¶ 34-38).

    2. <u>Irreparable Harm</u>[2]

"'To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.'" *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman*, 348 F.3d at 1189). It is "harm that cannot be undone, such as by an award of

---

[2] "When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004) (internal alteration and quotation marks omitted). Plaintiffs did not make this argument. Further, in this case, as discussed in this subsection, the EPA is involved in regulating the alleged discharges and BLM is in the process of coming into compliance with the CWA. Thus, the Court uses its equitable discretion to order relief that "will achieve *compliance* with the [CWA]." *Weinberger*, 456 U.S. at 318 (emphasis added).

compensatory damages or otherwise." *Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003).

Plaintiffs argue that BLM's illegal discharge is causing irreparable harm. (ECF No. 37-2 at 9-11.) Plaintiffs' argument, however, is not supported by the record. While it is true that environmental injury often constitutes irreparable harm, *Amoco Prod.*, 480 U.S. at 545, Plaintiffs fail to demonstrate that future remedial efforts will not be successful in stemming the loss of fish and other wildlife in Fourmile Creek3. Plaintiffs fail to demonstrate that future remedial efforts will not be successful in making the drinking water near the Myers' home safe for consumption. Further, Plaintiffs fail to demonstrate how monetary compensation is not sufficient to remedy the alleged harm due to Myers' having to travel to obtain water for drinking or irrigation purposes. "The possibility that adequate *compensatory* or *other corrective relief* will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted). In this case, Plaintiffs have failed to demonstrate that monetary compensation and future remedial efforts would not alleviate the harm suffered.

Further, when an environmental agency is engaged in ongoing regulation of the alleged irreparable harm, the threat of irreparable harm is reduced. *Sierra Club v. City of Colo. Springs*, 05-CV-01994-WDM-BNB, 2009 WL 2588696, at *16 (D. Colo. Aug. 20, 2009). The EPA, through the FCA, requires BLM to "develop any appropriate mitigation [plans] as determined by the BLM and the [Parks and Wildlife Division of the Colorado Department of Natural Resources

---

3 The Court understands Plaintiffs' position that the damage is irreparable. But the Court finds no support for this position in the Expert Report. (ECF No. 100-6 at 6, Carla Johnson Expert Report ("In order to ensure the restoration of the environmental ecosystem and preserve the water rights of the inhabitants who rely on the Fourmile Creek waterway, all discharges from the wells need to be stopped and the sites abandoned.").) Plaintiffs' Expert's report does not address whether future remedial efforts would or would not be successful. (*See generally* ECF No. 100-6.) And it is Plaintiffs' burden, as the movant, to establish irreparable harm.

(CPW)] to address impacts from uncontrolled discharges, including the potential impact of well completion." (ECF No. 76-28, FCA ¶ III.C.1.)  Thus, although an NPDES permit has yet to be issued for the discharges at issue (and it is unclear whether they will be issued), the EPA is involved in the regulation of the alleged irreparable harm through the FCA.

Based on the record, the Court finds that Plaintiffs have failed to demonstrate irreparable harm.

### 3. Balancing of Parties' Equities

In evaluating a request for injunctive relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod.*, 480 U.S. at 542.

Although the Court acknowledges that it is technologically feasible for Park Center to "tie into" Canon City's water-supply system (ECF No. 76-9, Aff. Wellen ¶ 7; ECF No. 75-8, Aff. Wade ¶ 12), the costs to Park Center could exceed $2.5 million which is *potentially* more than the costs to BLM of shutting down and opening up of the Old and New Wells respectively (ECF No. 76-26, Decl. Dawson ¶ 3).  Thus, should the Court grant the permanent injunction, there would be a heavy economic burden on a party to the case.

If the Court were to deny the permanent injunction, BLM will continue to discharge into Fourmile Creek.  BLM, however, has applied for an NPDES permit for finishing the New Well and for discharges that might occur in relation to closing the Old Well.  (ECF No. 76-29, Application.)  If BLM is successful in its application, BLM would no longer violate the CWA. And again, Plaintiffs have failed to demonstrate that future remediation efforts will not be successful in restoring Fourmile Creek such that the future discharges no longer present a threat to wildlife or to potable drinking water on Plaintiff Myers' property.

### 4. The Public's Interest

A court sitting in equity "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (citing *RR Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941)).

Park Center depends on water from the Old Well to serve its 4,000 users, *i.e.*, the public. (ECF No. 75-8, Aff. Wade ¶ 5.)  Park Center has no readily available source of replacement water—even taking into account Canon City's water system.  (ECF No. 75-8, Aff. Wade ¶ 11.)  Further, Canon City is not a party to this action and Plaintiffs have not demonstrated that Canon City has consented to providing water to Park Center's users.  *See* Canon City, Colo., Mun. Code § 13.04.120(A)(1) (2014) ("All new water service to be provided to properties outside the corporate limits of the city shall be provided to the terms, provisions, conditions and limitations of a written service contract, signed by the property owner and approved by formal action of [the Canon City] City Council.").  Thus, if the Court were to grant the permanent injunction, 4,000 citizens would be without an adequate and reliable source of treated water.  (ECF No. 75-8, Aff. Wade ¶¶ 6-12.)

Further, BLM, in compliance with the FCA, submitted to the EPA plans for managing controlled and uncontrolled discharges from the Old and New Wells.  (ECF Nos. 76-30, 76-31; *compare* ECF No. 76 ¶ 36 *with* ECF No. 102 at 2.)  And, pursuant to the FCA, should BLM's discharges from the wells exceed the EPA-set limits in the FCA or if "BLM becomes aware of any evidence that the . . . temperature may negatively affect the downstream aquatic life, the BLM will immediately . . . stop all discharges to the maximum extent practicable and notify the EPA. . . ." (ECF No. 76-28, FCA ¶ III.4.)  Thus, the public's interest in clean water is in the process of being fulfilled by the EPA and BLM's FCA.


Additionally, BLM and Cripple Creek have entered into a stipulation with regard to a certain portion of the water that is to be diverted through the Old Well. (ECF No. 76-11, Stipulation ¶ 4; ECF No. 76-13, Decl. Roy E. Smith ¶ 3(b).) If the Court were to grant the injunction, the Court would upset the settled expectations of Cripple Creek's water users.

## IV. CONCLUSION

Based on the foregoing, the Court:

(1) GRANTS, in part, Plaintiffs' Motion for Summary Judgment (ECF No. 37), to wit, the Court declares that BLM violated the CWA;

(2) DENIES Plaintiffs' request for injunctive relief without prejudice;

(3) ORDERS the parties to submit a joint-status report to the Court within fourteen days of entry of this Order as to what remains of Plaintiffs' Complaint (ECF No. 1) to be decided at a trial;

(4) ORDERS BLM, within thirty days of entry of this Order, to submit a report to the Court detailing its progress on finishing of the New Well and closing the Old Well; and

(5) ORDERS BLM, within thirty days of entry of this Order, to submit a report to the Court detailing the status of its NPDES permit application for the Old and New Wells.

The Clerk of the Court is directed to withhold entering JUDGMENT in this matter until the Court considers the parties' joint-status report and BLM's reports to the Court.

DATED this 13th day of January, 2015.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge